PEOPLE v BURTON

Docket No. 82216. Argued December 8, 1988 (Calendar No. 6). Decided
    August 25, 1989.

Norman L. Burton was convicted by a jury in the Oakland
    Circuit Court, Fred M. Mester, J., of two counts of first-degree
    criminal sexual conduct. During trial, statements by the com-
    plainant which were admitted as excited utterances under
    MRE 803(2) were used to establish the foundation for their own
    admissibility, and no independent evidence of the underlying
    startling event, direct or circumstantial, was offered. The Court
    of Appeals, GRIBBS, P.J., and BRONSON and C. D. STEPHENS, JJ.,
    affirmed in an unpublished opinion per curiam (Docket No.
    85654). The Supreme Court remanded the case to the Court of
    Appeals to consider the defendant's argument that the state-
    ments should not have been admitted. 428 Mich 915 (1987). On
    remand, the Court of Appeals, GRIBBS, P.J., and WEAVER and
    McDONALD, JJ., affirmed in an unpublished opinion per curiam,
    holding that the complainant's statements were properly ad-
    mitted as excited utterances because there was substantial
    corroboration of a startling event in addition to the statement
    that a startling event had occurred (Docket No. 102528). The
    defendant appeals.

In an opinion by Justice BRICKLEY, joined by Justices LEVIN,
    CAVANAGH, and ARCHER, the Supreme Court held:

Extrajudicial statements may not be admitted into evidence
    as excited utterances under MRE 803(2) where there is no
    independent evidence, direct or circumstantial, of the underly-
    ing startling event to which the statements relate; such state-
    ments, standing alone, may not establish the foundation for
    their own admissibility.

1. The excited utterance exception to the hearsay rule per-
    mits the admission of hearsay testimony regarding a statement
    relating to a startling event or condition made while the
    declarant was under the stress of excitement caused by the
    event or condition. The statement must arise out of a startling

REFERENCES

Am Jur 2d, Evidence §§ 708 et seq.
See the Index to Annotations under Hearsay; Res Gestae.

occasion, must be made before there has been time to contrive and misrepresent, and must relate to the circumstances of the startling occasion. Before a purported excited utterance may be admitted, it must be proven by a preponderance of independent evidence that the underlying event occurred. Evidence which establishes that the event could have occurred is insufficient; it must support a finding that the event did occur. In this case, the independent evidence establishes at most a stressful event with sexual overtones. While this evidence is consistent with the complainant's statements regarding a sexual assault, when considered apart from the excited utterance, it does not establish by a preponderance of evidence that the underlying startling event, i.e., a sexual assault, occurred. Absent independent proof of the startling events, the complainant's statements were not admissible.

2. Before a statement may be admitted as an excited utterance, it must be shown to relate to the independently proven startling event. Testimony by the complainant at trial that she had been slapped by the defendant in an argument about money, but had not been sexually assaulted, without independent evidence of a sexual assault or of another startling event linked to that sexual assault, did not provide sufficient foundation for the admission of her statements to the police officer which did not relate to the slap.

3. The trial court erred in permitting the jury to determine whether the criteria for establishing a foundation for the admission of the complainant's statement as an excited utterance had been met. Whether such conditions for admissibility have been met is to be determined by the court.

Reversed and remanded.

Chief Justice RILEY, joined by Justice GRIFFIN, writing separately, stated that sufficient evidence of bodily injury was presented to support the defendant's conviction. The first-degree criminal sexual conduct statute does not require that the bodily injuries suffered must necessarily be permanent or substantial.

Justice BOYLE, dissenting, stated that the trial court properly admitted the victim's statements to the police officer under the excited utterance exception. Independent proof of a startling event is not required to admit excited utterances.

The Rules of Evidence governing trials do not govern hearings under MRE 104(a) to determine admissibility. Extrinsic evidence available to a trial court in determining admissibility under MRE 104 is not limited to evidence that would be admissible at trial. All evidence, including hearsay, adduced at

a preliminary hearing may be considered in determining admissibility. The purpose of a hearing under MRE 104, as in this case, is only to determine whether the preliminary fact has been shown by a preponderance of evidence, not to establish the defendant's guilt. Whether statements will be admitted under the excited utterance exception is within the discretion of the trial court.

In this case, although the victim's statements were properly admitted, the evidence was insufficient to support the convictions of first-degree criminal sexual conduct. Thus, the case should be reversed and remanded to the trial court for entry of convictions of third-degree criminal sexual conduct or for a new trial.

1. EVIDENCE — HEARSAY — EXCITED UTTERANCES — INDEPENDENT EVIDENCE.

Extrajudicial statements may not be admitted into evidence as excited utterances where there is no independent evidence, direct or circumstantial, of the underlying startling event to which the statements relate; such statements, standing alone, may not establish the foundation for their own admissibility (MRE 803[2]).

2. EVIDENCE — HEARSAY — EXCITED UTTERANCES — UNDERLYING EVENTS.

Before a purported excited utterance may be admitted, it must be proven by a preponderance of independent evidence that the underlying event occurred; evidence which establishes that the event could have occurred is insufficient; it must support a finding that the event did occur (MRE 803[2]).

3. EVIDENCE — HEARSAY — EXCITED UTTERANCES — INDEPENDENT EVIDENCE.

Before a statement may be admitted as an excited utterance, it must be shown to relate to the independently proven startling event (MRE 803[2]).

4. EVIDENCE — HEARSAY — EXCITED UTTERANCES — FOUNDATION.

The determination whether hearsay statements meet the criteria for establishing a foundation for admission as excited utterances is to be determined by the trial court (MRE 803[2]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief,

Appellate Division, and *Thomas S. Richards,* Assistant Prosecuting Attorney, for the people.

*Faintuck, Shwedel & Wolfram* (by *William G. Wolfram*) for the defendant.

BRICKLEY, J. This unusual case presents the question whether extrajudicial statements sought to be admitted into evidence as excited utterances under MRE 803(2), standing alone, may establish the foundation for their own admissibility. Specifically, we are asked to decide whether such statements may be admitted when there is no independent evidence, direct or circumstantial, of the underlying startling event to which the statements relate. We answer this question in the negative and reverse the defendant's convictions.

### I. FACTS

Defendant Norman Leroy Burton was convicted by a jury of two counts of first-degree criminal sexual conduct. The counts alleged that the defendant had forced the complainant to perform oral sex acts with the defendant and with a second woman present at the defendant's house. After leaving the defendant's house, the complainant gave statements to Southfield Police Officer John Connors which accused the defendant of these crimes. Prior to the preliminary examination, the complainant recanted her earlier allegations and attempted to have the charges against the defendant dropped. At trial, both the complainant and the second woman were called as witnesses by the prosecution; neither alleged victim, however, gave testimony in any way inculpating the defendant with regard to criminal sexual conduct. Although the complainant was impeached with several earlier statements which incriminated the accused,

the sole substantive evidence that the defendant had committed criminal sexual conduct consisted of statements given by the complainant to Officer Connors.

A

Officer Connors testified that while he was on duty at 5:30 A.M. on August 5, 1983, he saw the complainant running down the street wearing a twisted dress and no shoes, looking over her shoulder as if someone might be pursuing her. He stated that the complainant appeared to be disheveled. Officer Connors pulled over, and the complainant entered his squad car. After waiting three to five minutes until the complainant "simmered down," Officer Connors asked the complainant what had happened. At first, Officer Connors was unable to get complete answers from the complainant. He then repeated his question two or three more times. After some hesitation, the complainant began to respond. Initially, the complainant stated that she had been sexually assaulted. Officer Connors stated that he asked her to clarify this response, but she did not provide any detailed information at that time. She indicated that she did not require immediate medical attention.[1] After calling in a backup unit, Officer Connors, accompanied by the complainant, drove around the neighborhood until the complainant located the defendant's house. By the time the complainant identified the defendant's house, she had calmed down. Officer Connors stated that she was "quiet now and just sat there. She didn't say too much." Officer Connors estimated that roughly forty-five minutes had elapsed from the time that he origi-

[1] Officer Connors later took the complainant to a hospital. No tests were performed, and she was not treated.

nally saw the complainant to the time that they located the defendant's house.[2] At some unspecified time during these forty-five minutes, the complainant began to answer Officer Connors' inquiries with specific descriptions of criminal sexual conduct by the defendant. Officer Connors testified that he conducted a question and answer series with the complainant not unlike an investigative interview of a witness at the station, and that the responses of the complainant were not simply blurted out during her excited state.

According to Officer Connors' testimony, the complainant's responses to his questions related the following story: She had accompanied an acquaintance to the defendant's house at 2:00 A.M. Once inside the house, the defendant ordered the complainant and a second woman to remove their clothing. The defendant became very angry and began slapping the women and threatening them with bodily harm. The defendant forcibly removed their clothing and then ordered the other woman to perform oral sex on the complainant. Both women initially resisted, and the defendant threatened them with more bodily harm and roughhousing until they complied with his demands. The other woman then performed cunnilingus on the complainant. After some time, the defendant ordered the two women to switch positions. Again, both women resisted and, after more threats and roughhousing, they complied. The defendant then grabbed the complainant in a headlock and forced her to go upstairs to his bedroom. After dragging the complainant to his bedroom, the defendant ordered her to perform oral sex on him. When the complainant resisted, the defendant threatened

---

[2] Subsequently, the police executed a search warrant at the defendant's house. The complainant's brassiere was found on the premises, and her shoes and underwear were retrieved from a small bag in the defendant's possession.

her again, grabbed her head, and forced his penis into her mouth. She eventually obtained the permission of the defendant to use the bathroom. She then ran back downstairs to the living room, pulled her dress over her head, and ran out down the street.

The trial testimony of the complainant regarding the events at the defendant's home was radically different from and inconsistent with the account related by Officer Connors. The complainant was called by the prosecution. She testified that she agreed to accompany an acquaintance to the defendant's house, where she expected to be paid for having sex with the defendant. After she arrived, she and the defendant went upstairs to the defendant's bedroom. She had taken her dress off downstairs and disrobed completely in the bedroom. She requested money from the defendant, but the defendant refused and accused her of having taken money from him. She and the defendant then got into an argument during which she began to get very angry and began screaming at the defendant and calling him names. The yelling and screaming continued for five or ten minutes. She stated, "Well, I began to demand something from him and I guess I must have said the wrong nasty words to him and he slapped me and I got angry, cried and ran out." The complainant further testified that she grabbed her dress and ran out of the house down the street in anger. She stated that the defendant struck her one time in the face and it did not hurt much, other than her pride; however, she became very angry. She explained that she expected the defendant to come after her and try to talk to her, so she kept running and hid behind some bushes until she saw his car pass by. Subsequently, she was observed by officers in a passing police car, and she got into the

police car when it pulled over. The complainant testified that she did not perform oral sex on either the defendant or the other woman present at the defendant's house. She decided to tell the police that the defendant had raped her in order to get back at him for having slapped her. Finally, she testified that fifteen to twenty minutes, or perhaps a slightly longer amount of time, elapsed between the time she left the defendant's house and the time she was picked up by the police officers.

The second woman, the only other eyewitness called by the people, also contradicted the earlier statements made by the complainant. She testified that she was asked to swear out a complaint against the defendant for criminal sexual conduct, but refused "[b]ecause that didn't happen." She stated that the defendant did not rape her or force either woman to perform oral sex on the other and that she did not see the defendant rape anyone else or hear any yelling, screaming, or fighting coming from upstairs. She further testified that she saw the complainant run down the stairs, grab something, and run out of the house. This witness also corroborated the complainant's trial testimony that the defendant was missing some cash, stating that the defendant asked her that evening whether she had found any money. Finally, she testified that she had been advised by the police that the defendant was a horrible person who should be gotten off the street.

After testifying favorably for the defendant as she had at the preliminary examination, the complainant was impeached at great length by the calling party, the prosecution, with earlier statements consistent with her original story to Officer Connors. First, Detective Kukla testified that on the morning of August 5, 1983 (the morning fol-

lowing the incident), complainant gave him a description of what had taken place at the defendant's house, which was somewhat more detailed than the version provided by Officer Connors. The complainant testified that the reason she repeated her story to Detective Kukla was because she was still angry and had planned to repeat the accusations. She also stated that she wanted to get even with the defendant because he had slapped her and would not pay her for her services. The following day, Saturday, August 6, 1983, the complainant attempted to have the charges against the defendant dropped. The complainant testified that when she went back to the station that day, the police told her that she was doing the wrong thing and that the defendant was someone who needed to be kept off the streets. She stated that she was visited the evening before by Mr. Smith, the acquaintance who brought her to the defendant's house, Cheryl (Smith's girl friend), and Ronald Dease, who held himself out to be defendant's attorney.

On the following Monday, August 8, 1983, Detectives Kukla and Bolling went to the complainant's apartment. Detective Kukla testified that the complainant told him that she had been visited first by three persons who suggested that it would be in her best interest to drop the charges. Detective Kukla testified that the complainant had stated that she feared for her safety and would possibly be harmed by someone. Despite the fact that she had been advised to drop the charges in her best interest, she nevertheless stuck by her original statement.

The next day, August 9, the complainant was brought to the Oakland County Prosecutor's office. There, she declined an offer to be placed in a witness protection program. A material witness

warrant requiring a $50,000 cash bond was issued against the complainant. On the evening of August 9, Detectives Kukla and Bolling and Prosecutor Sosnick took taped statements from the complainant. The complainant testified that she had been told by the police that she would be put in jail pursuant to the material witness warrant prior to having made the statements. At some point, the complainant was held overnight pursuant to the warrant and was released the following day through the intervention of an appointed attorney. The date of the complainant's incarceration is not clear.

Over the vigorous objection of defense counsel, the tape of the interview with the complainant was played in its entirety to the jury for the purpose of testing the witness' credibility. The jury was provided with photocopied transcripts of the interview. During the interview, the complainant stated that persons had advised her to drop the charges against Mr. Burton. "[T]hey just told me that he was a very big and powerful man and that, you know, that he had plenty of power as well as money, and he had beat cases before and he had just beat a natural life murder case which he only did a year for and got out." In response to a question by Detective Bolling as to whether Mr. Dease had mentioned anything about the defendant having killed people in the past, the complainant stated, "Yeah, that's the one reason why he did the . . . had the natural life thing . . . for killing someone." The complainant responded in the affirmative to the question by Detective Bolling whether statements made by other people to her made her think that she was in some sort of physical danger if she proceeded against the defendant. This was because different people told her how powerful a person he was. The complainant

testified that Mr. Smith was afraid not only for her sake, but for himself as well. Mr. Smith, his girl friend Cheryl, and Ronald Dease (the persons who contacted the complainant) were not produced at trial. No evidence was presented linking these people either to the defendant or to his attorney, Otis Culpepper. The defense chose to rest without presenting evidence following the close of the prosecution's case.[3]

B

Defense counsel Culpepper filed an unsuccessful motion in limine to suppress the complainant's statements to Officer Connors, arguing first the circuity of using an excited utterance to prove its own foundation and, second, the absence of spontaneity in the making of the statements.

After the Court of Appeals affirmed the convictions on defendant's appeal of right, we remanded this case to the Court of Appeals to consider "the defendant's argument that the complainant's statements should not have been admitted as excited utterances because the statements themselves were the only evidence that an event capable of provoking an excited utterance had occurred." 428 Mich 915 (1987).

The Court of Appeals, on remand, declined to address this argument on the ground that "there was substantial corroboration of a startling event in addition to the statement that a startling event had occurred." The substantial additional evidence discerned by the Court of Appeals consisted of the following facts: the complainant was wearing only

---

[3] The record does not support Justice BOYLE's assertion that "threats . . . were made to [the complainant] afterwards," *post,* p 312, that "the victim had been threatened," *post,* p 319, or that there were "intervening threats against the victim," *post,* p 326, n 38.

a dress, she looked over her shoulder as she ran, she tried to get into the squad car before Officer Connors unlocked the door, she continued to cry for a time while in the car, she repeated her story later that morning, and articles of her clothing were found in the possession of the defendant and in his house.

We granted leave to appeal on the following issues:

(1) Whether the complainant's initial statements to the responding police officer were properly admitted as excited utterances under MRE 803(2);

(2) Whether there was sufficient evidence to support the conviction of first-degree criminal sexual conduct;

(3) Whether the jury instruction on the mental anguish element of the offense was error requiring reversal; and

(4) Whether the trial court erred by allowing the prosecutor to impeach the complainant's recantation with evidence that she had received threats that included references to other crimes committed by the defendant. 430 Mich 891 (1988).

## II. THE ADMISSIBILITY OF THE COMPLAINANT'S STATEMENTS UNDER MRE 803(2)

### A

In *People v Gee,* 406 Mich 279, 282; 278 NW2d 304 (1979), this Court described the excited utterance exception to the hearsay rule as follows:

Otherwise objectionable hearsay testimony may

be admissible if it amounts to an excited utterance. An excited utterance is defined as:

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." MRE 803(2).

To come within the excited utterance exception to the hearsay rule, a statement must meet three criteria: (1) it must arise out of a startling occasion; (2) it must be made before there has been time to contrive and misrepresent; and (3) it must relate to the circumstances of the startling occasion. *People v Cunningham,* 398 Mich 514, 519; 248 NW2d 166 (1976), citing *Rogers v Saginaw B C R Co,* 187 Mich 490, 493-494; 153 NW 784 (1915).

We first consider whether a proffered excited utterance, standing alone, may be used to satisfy the conditions for its own admissibility. While the specific question in this case—whether such a declaration may establish the underlying startling event—has not been considered by Michigan courts, a related issue was considered in *Rogers.* At issue there was whether a statement could be used to establish its own spontaneity. No evidence apart from the statement of plaintiff's decedent was proffered linking the time of the startling event to the delivery of the declaration at issue.

But how can the . . . condition be met without direct and independent evidence of the time of the startling occasion with reference to the making of the statement? For aught that appears beyond the statement itself, the injury may have occurred three or four hours before the statement was made, and it does not appear that plaintiff's decedent had lost at any time control of his faculties. In such an event, the element of spontaneousness is absent. And it is for the proponent to discharge the burden of proving spontaneousness, or the

statement is rejected as hearsay. . . . Had the
plaintiff presented witnesses who could swear that
they saw the decedent on the street car in a
normal physical condition, unhurt, shortly before
the injury, it might with reason be claimed that
then the condition of admissibility would have
been met and the spontaneousness of the state-
ment established. Manifestly, the decedent's state-
ment cannot be used for this purpose, because it
has not yet been admitted. But, since the unsworn
statement of John Rogers has not been proved to
be a spontaneous exclamation, it is not within this
exception to the hearsay rule. Not being within
any other exception, it is objectionable and inad-
missible as hearsay evidence. . . . The question of
the failure of proof as to the time of the happening
of the event independent of the statement was
considered in the well-reasoned case of *State v
Williams,* 108 La 222; 32 S 402 [1902], where it
was said:

   " . . . The admissibility itself of the statements
being the very question at issue for decision, no
part of them are to be used for the purpose of
determining it. Counsel very correctly say: 'There
being no foundation for the admission of the decla-
ration, it was used as its own foundation and was
itself the basis on which it was admitted.' " [*Rog-
ers, supra,* pp 494-495. Citations omitted.]

In *People v Vega,* 413 Mich 773; 321 NW2d 675
(1982), we considered the admissibility of coconspi-
rators' statements under MRE 801(d)(2)(E). We
held in *Vega* that MRE 104 and 801(d)(2)(E) re-
quire that the underlying conspiracy be proven by
a preponderance of independent evidence before a
proffered coconspirator's statement may be placed
before the trier of fact. We observed that our
inclusion in MRE 801(d)(2)(E) of the independent
proof requirement, which is not present in its
federal counterpart, was necessary because "[a]ny
other rule 'would lift [hearsay] by its own boot-

straps to the level of competent evidence.' " *Vega,
supra,* p 780, quoting *Glasser v United States,* 315
US 60, 75; 62 S Ct 457; 86 L Ed 680 (1942). In our
opinion, the independent proof requirement of
MRE 801(d)(2)(E) militates in favor of reading a
similar requirement into the excited utterance
rule because it evidences our disinclination to
allow the "bootstrapping" of hearsay evidence.
That we did not explicitly include a similar re-
quirement in MRE 803(2) is of no significance for
two reasons. First, the requirement in MRE
801(d)(2)(E) codified prior case law. *Vega, supra,* p
780. With regard to the excited utterance excep-
tion, however, there were no prior cases requiring
independent proof of the startling event. This fact
suggests the second reason: cases such as the
present are extremely rare relative to those in-
volving the admissibility of coconspirators' state-
ments.

The conclusion suggested by *Rogers* and *Vega* is
buttressed by criminal cases from other jurisdic-
tions which have held hearsay statements inadmis-
sible as excited utterances where no independent
proof of the underlying startling event was pre-
sented.

*Commonwealth v Barnes,* 310 Pa Super 480; 456
A2d 1037 (1983), is directly on point. In *Barnes,*
the victim of a robbery died of unrelated causes
prior to Barnes' trial. Shortly after the robbery,
the agitated victim told a police officer that Barnes
had entered the victim's apartment, struck the
victim, pushed the victim to the floor, threw a
sheet over the victim's head, and removed $300
from a drawer in the victim's bedroom. Because of
the victim's unavailability, the only evidence of
the startling events was the extrajudicial state-
ment made by the victim to the police officer.
There was no independent evidence of a forced

entry into the victim's apartment, no independent evidence that the victim had been bruised or otherwise injured, and no evidence that the victim either had $300 in his possession before the robbery or that any money belonging to the victim had been stolen. In addition, a search of Barnes' apartment conducted shortly after the robbery did not produce any of the allegedly stolen cash. The court stated:

> We are thus presented with the troublesome situation in which the excited utterance itself is being used to prove that an exciting event did, in fact, occur. This circuitous reasoning is unacceptable. Where there is no independent evidence that a startling event has occurred, an alleged excited utterance cannot be admitted as an exception to the hearsay rule. [*Id.*, p 485.][4]

The court in *People v Leonard,* 83 Ill 2d 411; 415 NE2d 358 (1980), aff'g 80 Ill App 3d 741; 400 NE2d 568 (1980), held that some evidence of the existence of a startling event must be produced before a statement can be admitted as a spontaneous utterance. However, the *Leonard* court found that corroborative testimony by eyewitnesses to the underlying startling event provided sufficient circumstantial evidence that the event had in fact occurred.

*Leonard* has been followed in recent Illinois appellate decisions. In *People v Coleman,* 116 Ill App 3d 28; 451 NE2d 973 (1983), the court reversed convictions where purported excited utter-

---

[4] Although the court found that there was no independent evidence of *an* exciting event, the fact that the complainant in this case testified to a potentially startling event—a slap from the defendant during an argument over money—does not distinguish this case from *Barnes,* because the complainant here, like the victim in *Barnes,* did not testify regarding a startling event to which the alleged excited utterances related. See the discussion in section II(C), below.

ances were admitted as bearing on the defendant's motive. These statements were held inadmissible because there was insufficient evidence of an underlying startling event. *Coleman, supra,* p 34. In *People v Webb,* 125 Ill App 3d 924; 466 NE2d 936 (1984), the court found that a homicide victim's statement to a policeman identifying his assailant was admissible because the police officer who took the statement testified that the victim was bleeding from a gunshot wound and moaning for help. Thus, there was independent evidence that a startling event—a gunshot wound—had occurred. *Id.,* p 933.

In *Brown v United States,* 80 US App DC 270; 152 F2d 138 (1945), the victim of an assault, a three-year-old girl, was held incompetent to testify. The trial court admitted statements made by the child to her mother as excited utterances. The court reversed defendant's conviction on the grounds that the child was not excited when she recounted the events to her mother. The court also stated, however, that even if the child had been excited, her statements, as recounted by her mother at trial, would have been inadmissible because there had been no independent evidence of an exciting event. *Id.,* pp 271-272.

> This exception to the hearsay rule has commonly been applied only when there had been independent evidence of an exciting event; testimony other than the hearsay statement has proved that a collision occurred, a shot was fired, or the like, and the hearsay has served only to identify the actors or to specify their conduct. If, for example, there is no evidence of any assault except A's testimony that B cried "Smith shot at me," we do not convict Smith of assault, however excited B's cry appears to have been. It is not apparent that this principle should be ignored

when the assault charged is an indecent one. [*Id.,*
p 272.]

*Brown* was followed in *Jones v United States,* 97
US App DC 291; 231 F2d 244 (1956). In *Jones,* as
in *Brown,* the only evidence that an indecent
assault had occurred was the child's account of the
assault as related by her mother at trial. There
was no physical evidence of an assault. The court
reversed the conviction on the grounds that (1) the
statements were not admissible as spontaneous
statements, and (2) that the statements were insuf-
ficient to establish the corpus delicti.

In *State v Terry,* 10 Wash App 874; 520 P2d
1397 (1974), the court reversed a murder convic-
tion on the basis of an improperly admitted ex-
cited utterance. The defendant there was convicted
for second-degree murder of a three-year-old child.
Over objection, the prosecution elicited a state-
ment from a witness who reported having heard
someone else tell the defendant not to choke a
baby other than the one who was allegedly killed
by the defendant. The court held this testimony
inadmissible not only because it failed to relate to
the murder for which the defendant was being
tried, but also because the defendant's treatment
of the other child was not established except by
the hearsay testimony itself. *Id.,* p 880.

Both *Barnes* and *Leonard* endorsed the reason-
ing found in *Truck Ins Exchange v Michling,* 364
SW2d 172 (Tex, 1963). *Michling* was a workers'
compensation case in which the only evidence
offered to show that the decedent had suffered an
injury in the scope of his employment was a
statement made by the decedent himself. The fact
that the decedent had died from a cerebral hemor-
rhage which *may* have been caused by a blow to
the head was not considered independent evidence

absent any visible mark of injury on the decedent's head. The court stated:

[I]n this case the only evidence of the occurrence is the hearsay statement. Thus the Court of Civil Appeals is conceding credit to a narrative to prove the very circumstances from which it is said to derive its credit. Its trustworthiness, as to the happening of an accident, is presumed from the influence of the accident which its trustworthiness is taken to prove. Thus this proof, to use a trite expression, is attempting to lift itself by its own bootstraps. [*Id.*, p 174.]

Regarding the traditional wide latitude extended to trial courts in ruling on the admissibility of statements under the excited utterance exception, the court stated:

[T]he discretion of the trial court does not extend to the admission of the testimony here for the reason that there is no proof otherwise of the occurrence of which the statement is asserted to be a part. [*Id.*]

The *Michling* decision was followed by the Supreme Court of Texas in *Richardson v Green*, 677 SW2d 497 (Tex, 1984). There, a father's parental rights were reinstated after a jury had voted to terminate the rights on the basis of alleged sexual abuse of the child by the father. The testimony adduced against the father consisted solely of hearsay statements made by the child to other people.

The people cite four cases of relatively recent vintage from our Court of Appeals for the proposition that Michigan is prepared to follow the "majority rule," which is said to allow the underlying event to be proven by the excited utterances.

However, these cases, like those which consti-

tute the supposed majority rule, are distinguishable from the instant case. In each case, there was independent evidence tending to show the existence of the startling event.

The prosecutor first argues that under *People v Mosley*, 74 Mich App 145; 254 NW2d 33 (1977), the description by Officer Connors of the victim's behavior and condition warrants the inference that a sexual assault had occurred. However, in contrast to the complainant in the instant case, the victim in *Mosley* was "swollen, bleeding, shaking and nervous" at the time she made a statement to a witness that her husband " 'did this to her.' " *Id.,* p 148. In addition, "the evidence showed that the victim, defendant's wife, was beaten to death." *Id.,* p 147. Thus, the physical description from which the Court held that the trial judge could infer the underlying startling event consisted of unmistakable signs, outwardly visible, that the victim had been violently assaulted.

Likewise, in *People v Hungate,* 27 Mich App 496; 183 NW2d 634 (1970), there was "[c]onsiderable circumstantial evidence" connecting the declarant with the startling event in question, an illegal abortion. The victim's companion testified with regard to the suspicious circumstances attending their trip to the office where the abortion was performed, and after the victim returned from the office, she was "seriously sick, lying on a couch, vomiting blood and bleeding . . . ." *Id.,* p 499. In addition, foundation testimony established that the victim was pregnant before her death and that her death was caused by an infection following a miscarriage. Thus, the startling event, also the corpus delicti, was established by independent circumstantial evidence.

The prosecutor next suggests that *People v Randall,* 42 Mich App 187; 201 NW2d 292 (1972), and

*People v Meyer,* 46 Mich App 357; 208 NW2d 230 (1973), establish that "an excited utterance may be used to prove the corpus delicti of a crime even where there is no independent proof." We disagree. In *Randall,* several out-of-court statements made by the defendant were admitted against him at trial. The defendant argued that he could not be convicted on the basis of his confessions or admissions alone. The Court noted that some of the defendant's statements apart from this transcribed confession would have fallen within two exceptions to the hearsay rule. *Id.,* p 192. The Court eschewed detailed discussion of the various statements, however, because "[e]ven if the admissions are totally disregarded there is ample evidence to show the corpus delicti." *Id.*

In *Meyer,* two defendants made inculpatory statements to police officers who found a friend of the defendant dead of a drug overdose. Independent evidence established the corpus delicti—the decedent's death by an injection of heroin. Thus, the issue in *Meyer* was not whether the underlying event had occurred but rather the identity of the perpetrator. The excited utterances, relating to the independently established event, resolved the identity issue.

The prosecution directs our attention to several authorities in support of its contention that the majority view would allow the startling event to be established by the excited statement. Nearly all of the older cases cited by these authorities involve statements concerning personal injuries, and most of these cases arose in the context of workers' compensation. We believe that these cases are better cited for the proposition that an excited utterance may be admitted when the occurrence of the underlying event (generally a work-related

injury) is corroborated by independent circumstantial or direct evidence.

First, the prosecutor quotes from McCormick:

> Under generally prevailing practice, the statement itself is taken as sufficient proof of the exciting event and therefore the statement is admissible despite absence of other proof that an exciting event occurred. [McCormick, Evidence (3d ed), § 297, p 855.]

While the prosecution states that this edition of the McCormick treatise dates from 1984, we note that the most recent case cited by McCormick, *supra*, p 855, n 11, was decided in 1943. All four of these cases involve personal injuries, and three are workers' compensation cases. In *Stewart v Baltimore & O R Co*, 137 F2d 527 (CA 2, 1943), the decedent died of heart strain after trying to throw an allegedly defective switch in a railroad yard. The decedent had been in good health prior to the date of the accident. *Id.*, p 528. The decedent reported to a co-worker that he had injured his side in unsuccessfully attempting to throw the switch. The court admitted the decedent's statement to the co-worker as part of the res gestae. However, there was evidence to substantiate the decedent's injury. First, the co-worker testified that he had to use an iron bar two feet long to pry the switch, but did not need to use the bar on other switches, which tended to show that the switch was in fact difficult to move. Second, the decedent began to suffer severe pains in his chest shortly after the incident. Third, the decedent made subsequent statements regarding the cause of his pain to a physician for the purpose of medical diagnosis. Fourth, the doctor testified that the decedent had died as a direct consequence of the injury during his work. *Id.* Likewise, in *Indus-*

*trial Comm v Diveley,* 88 Colo 190; 294 P 532 (1930), the court held admissible as part of the res gestae statements made by a worker to family members after having sustained an injury while alone at work. The decedent had stated that he sustained severe abdominal pains after lifting a heavy object. *Id.,* p 192. Once again, circumstantial evidence corroborated the decedent's injury. The condition of the decedent tended to show an injury, and there was testimony that the decedent had been physically strong and did not suffer from any physical ailment prior to the date of the accident. *Id.* Two days after the alleged injury, the decedent was taken to the hospital, where he was discovered to have a ruptured appendix. He subsequently died of peritonitis. In *Johnston v W S Nott Co,* 183 Minn 309; 236 NW 466 (1931), a decedent's spontaneous statement that he had fallen at work was admitted as part of the res gestae. His statement was corroborated by his condition. Testimony showed that he had a bad bump on the back of his head and that his death shortly after the accident was caused by a blow to the head. Finally, in *Collins v Equitable Life Ins Co,* 122 W Va 171; 8 SE2d 825 (1940), the decedent's statement to coworkers that he had sustained an injury on the way in to work was supported by circumstantial evidence: he was seen walking briskly to work shortly before the accident, he appeared to be in a considerable amount of pain when he arrived at work shortly thereafter, a doctor found the decedent to have been suffering from a tingling in both arms and from pain in the upper abdomen and chest, and other witnesses testified that his arms were bruised. *Id.,* p 172.

The prosecution also refers to Slough, *Res Gestae,* 2 U Kan L R 246, 255-256 (1954).

The present question is no doubt tested most frequently in the workmen's compensation cases when determining whether or not injuries have arisen out of and in the course of employment. . . .

Though the question is too restricted to warrant a summation of majority and minority decisions, there is a tendency to relax ordinary prerequisites for admission of testimony of this nature. An increasing number of cases are being decided wherein the only direct evidence of the exciting event is the declaration itself. Edmund Morgan, in commenting upon the situation, asserts that theoretical distinctions may well have to give way to practical considerations, thus bowing to the policy which regards every injury that occurs while a man is employed as *prima facie* compensable.

While there may not have been *direct* evidence, there was nevertheless *circumstantial* evidence of the underlying injury in these cases. The article cites, among other cases, *Bunker v Motor Wheel Corp,* 231 Mich 334; 204 NW 110 (1925). In *Bunker,* a workers' compensation case, a laid-off employee returned to work for one day. The Court allowed statements of the decedent to a co-worker as part of the res gestae. The decedent had told the co-worker that he dropped a wheel on his toe and that it hurt him tremendously. The co-worker testified that he then saw the decedent sit down and take his shoe off. Evidence showed that the decedent was not lame prior to the day in question, and that on returning from work later that day, he was lame and his great toe was bruised, discolored and lacerated. *Id.,* p 336.[5] See also *McGowan v Peter Doelger Brewing Co,* 10 NJ Super 276; 77 A2d 46 (1950), and *Preferred Accident Ins Co of NY v Combs,* 76 F2d 775 (CA 8, 1935) (the

[5] Of similar import is *Froman v Banquet Barbecue, Inc,* 284 Mich 44, 51; 278 NW 758 (1938).

decedent's physical condition corroborated his statement relating to the injury). In *Young v Stewart,* 191 NC 297; 131 SE 735 (1926), the plaintiff testified with regard to his wife's comment upon her discovery that a diamond was missing from her ring. The plaintiff testified having seen the diamond in her ring earlier that evening. *Id.,* p 303. Thus, the wife's startling event—her having lost the diamond—was corroborated by circumstantial evidence.

In *Armour & Co v Industrial Comm,* 78 Colo 569; 243 P 546 (1926), which typifies the evidentiary problem in these workers' compensation cases, the court held admissible as part of the res gestae statements made by the decedent-employee despite the absence of independent proof that the injury was work related. The underlying startling event (the injury), however, was established by "competent and sufficient" evidence. *Id.,* p 571.

These cases should be contrasted with *Michling, supra,* in which the court refused to allow the admission of a deceased worker's statements where there was no independent proof that he had been at work on the day of the alleged accident, that he had suffered an accidental injury, or that an accidental injury had contributed to his fatal cerebral hemorrhage (which, according to medical testimony, resulted from a congenital vascular defect).

In sum,

a declaration cannot possibly be admitted as "part of the *res gestae*" of an event of which it is itself the only evidence; that is, where there is no other prima facie evidence of the appropriate time and place, and of the force or impact, of an alleged accident. Decisions appearing to contradict this proposition on their facts, if sound at all, should be placed on some other ground. [163 ALR 219.]

*United States v Moore,* 791 F2d 566 (CA 7, 1986), cited by the prosecution, is also distinguishable from the instant case. There, the occurrence of the startling event was corroborated by evidence other than the resulting excited utterance. *Id.,* p 574, n 6.

Weinstein, however, appears to support the prosecution's position. Citing McCormick and Slough, discussed above, Weinstein asserts that the "modern trend" is to allow excited statements to prove the underlying startling event. 4 Weinstein, Evidence, ¶ 803(2)[01], p 803-88. Weinstein does not specifically address the situation in which the hearsay statement furnishes the *only* basis for its admissibility, and the authorities cited do not establish that the modern trend supports such a position. Weinstein further states that

> [s]uch an approach though somewhat unsettling theoretically as an example of a statement lifting itself into admissibility by its own bootstraps, is justified by the last sentence of Rule 104(a) which provides that in making preliminary determinations the judge "is not bound by the rules of evidence except those with respect to privileges." A hearsay declaration may be used to establish the foundation for a hearsay exception. Any other approach would greatly undermine the utility of the exception by causing valuable evidence to be excluded. [*Id.*]

To the extent that Weinstein's position can be applied to the facts of the instant case, his views are open to criticism. First, it is clear that neither MRE 104 nor its federal equivalent, FRE 104, cloak the trial court with unfettered discretion in ruling on the admissibility of evidence. For example, with regard to the admissibility of coconspirators' statements, the Court must determine that

the underlying conspiracy has been proven by a preponderance of independent evidence under MRE 801(d)(2)(E), in spite of the provision in MRE 104(a) that the Court is not bound by the Rules of Evidence. *Vega, supra.* Nor does FRE 104 allow coconspirators' statements to be admitted when there is no other proof of the conspiracy. *Bourjaily v United States,* 483 US 171; 107 S Ct 2775; 97 L Ed 2d 144 (1987). Second, Weinstein's justification for admitting excited statements to establish the startling event is unsatisfactory—the application of many exclusionary rules may result in the loss of valuable evidence. In general, potentially valuable hearsay statements are excluded because of the "many possible sources of inaccuracy and untrustworthiness which may lie underneath the bare untested assertion of a witness . . . ."[6] Many hearsay statements are allowed into evidence not because they are valuable, but because the requirements of the rule under which they are admitted furnish a circumstantial *probability* of accuracy and trustworthiness.[7]

In short, the prosecution has established neither a majority rule nor a disposition on the part of Michigan courts to allow an excited utterance to prove the underlying event when there is no independent proof, direct or circumstantial, that the event ever took place. Absent independent proof of the startling events—the sexual assaults—the complainant's statements were not admissible.[8]

---

[6] 5 Wigmore, Evidence (Chadbourn rev), § 1420, p 251.

[7] Wigmore, n 6 *supra,* § 1422, pp 253-254.

[8] We observe that *Jones, supra,* and the dissenting opinion in *Barnes, supra,* take the position that uncorroborated extrajudicial statements are insufficient to establish the corpus delicti in a criminal case. The defendant does not argue that the complainant's statements, if admissible, would not constitute sufficient evidence on which to base his convictions. Having decided that the complainant's statements to Officer Connors were not competent evidence, we decline to address this issue.

B

We turn now to the question whether the evidence which may be considered apart from the purported excited utterance proves by a preponderance of the evidence that the underlying event occurred.

It is the presence of a startling event that lends the utterance emanating therefrom its special reliability. Care must be taken to ensure that this principle is not reversed, that is, the excited utterance must not be used to substantiate the event from which the utterance must be shown to have arisen. In order to guard against this "bootstrapping," we must determine whether the non-excited-utterance evidence independently furnishes proof of the underlying event.

It is also important to determine precisely what event such independent evidence substantiates because of the established principle that the excited utterance must be shown to relate to the independently established event before the utterance may be admitted.[9]

We begin our discussion of the independent evidence with the recognition that a trial judge ruling on the admissibility of evidence need not confine his review to admissible evidence only. MRE 104(a). Given that the underlying startling event must be established by evidence independent of the proposed excited utterances, however, we take exception to Justice BOYLE's conclusion that subsequent, unexcited hearsay statements by the same declarant may be used by the trial judge to provide the independent proof of the underlying startling event. Justice BOYLE's approach would allow the admission of an excited utterance whenever the declarant can be induced to repeat the

[9] See section II(C), below.

statement under circumstances bereft of the very spontaneity on which the reliability of the original, excited declaration depends. Such a result would allow the least reliable hearsay evidence to furnish the foundation for the more reliable hearsay statement. In effect, MRE 104(a) would swallow MRE 803(2) rather than serve it.

We also disagree with Justice BOYLE, in her evaluation of properly considered independent evidence, that the "threats" in this case are probative of the existence of a sexual assault. We find nothing in the record to support either Justice BOYLE's repeated assertions that the complainant was threatened or, assuming that threatening remarks were made, the proposition that they were connected with the defendant. The taped interview, which was admitted to impeach the complainant, does indicate that the complainant was approached by several people who suggested to her that the defendant was a dangerous person. The man who communicated this information felt that he, too, could be in jeopardy because he had brought the complainant to the defendant's home and might be accused of a "set up."

If our goal were to explain why the complainant recanted, evidence of threats, if present, would be relevant and probative. Even if we were merely trying to determine the truth of a prior statement by a threatened witness (rather than the existence of a proper foundation for the statement's admissibility), however, the existence of threats would not aid our determination because a defendant confronted by the prospect of potentially damaging in-court testimony would have a strong incentive to prevent the introduction thereof regardless of its truth. In the instant case, we fail to discern any relevance of threats, not to the truth of the com-

plainant's utterances, but to the establishment of the underlying startling event.

Finally, we disagree with Justice BOYLE that the complainant's preliminary examination testimony is relevant evidence on the issue of the underlying event. The complainant admitted having made some of the responses to which Officer Connors testified but denied that those statements were true. Because the purported excited utterances may not be used to establish the event from which they were claimed to have emanated, the mere fact that the utterances were made cannot contribute to the preliminary inquiry into the existence of the startling event.

We agree with Justice BOYLE regarding the other items of proof which could be considered in answering this inquiry. We consider, of course, the complainant's demeanor, physical condition and appearance at the time of the utterance since they are not part of the utterance themselves. We also consider the defendant's attempt to remove the complainant's shoes and panties from his house, as well as the discovery in the house of the complainant's brassiere. Although not mentioned by Justice BOYLE, the testimony of the other woman present at the defendant's house may also be considered. This eyewitness, with whom the complainant was allegedly forced to perform sexual acts, testified that she refused a police request to swear out a complaint against the defendant because the alleged acts did not occur, and her exculpatory testimony contradicted the prosection's version of the facts. Had this eyewitness provided direct testimony of a sexual assault, the existence of the underlying event could have been established; the relevancy of her testimony is not diminished by the fact that she testified adversely to the prosecution.

We return now to consider what, if any, exciting event has been proven by a preponderance of properly considered evidence. We find that this evidence establishes at most a stressful event with sexual overtones. While this evidence would certainly *corroborate* the testimony of a victim stating that a sexual assault had occurred, it does not, when considered apart from the excited utterance, *establish* the existence of a sexual assault.

As one court has explained,

> Evidence which establishes only that the event *could have* occurred does not satisfy the requirement; it must be sufficient to support a finding that it *did* occur. [*Hartford Accident & Indemnity Co v Hale*, 400 SW2d 310, 311 (Tex, 1966). Emphasis in original.]

It is only when the utterance is used that the event is elevated from an unexplained stressful event to a sexual assault. Excited utterances can be seductive and carry the risk that they will be used to establish the event that must be *independently* proven. In this case, without the excited utterance, the facts before the court are, of course, not inconsistent with either the complainant's purported excited utterance or her exculpatory postrecantation statements, or for that matter, with other possible scenarios; but while the independent proofs are consistent with both of these versions, standing alone they do not independently support by a preponderance of evidence a forcible sexual assault. Again, the question is not whether they corroborate the excited utterance, but whether they independently support the startling event to which the excited utterances relate.

The independent evidence does not even mention, let alone prove, a forcible sexual assault.

Rather, this evidence at most establishes some
stressful event with sexual connotations. The pur-
ported excited utterances themselves should not,
and cannot, furnish the missing link to the estab-
lishment of the specific startling event to which
the utterances must relate and from which they
must arise.

C

We now address the argument that the com-
plainant's earlier accusations were admissible on
the ground that she furnished direct proof of *a*
startling event by testifying at trial that she had
been slapped by the defendant. We find this theory
untenable because the incriminating statements
did not relate to the slap to which the complainant .
testified at trial.

Of the three foundational requirements of the
excited utterance exception "the requirement that
the statement relate to the startling occurrence is
virtually always satisfied . . . ." *People v Ivory
Thomas,* 14 Mich App 642, 650; 165 NW2d 879
(1968) (LEVIN, J., concurring). Nevertheless, in
*McAvon v Brightmoor Transit Co,* 245 Mich 44;
222 NW 126 (1928), this Court held inadmissible a
spontaneous statement because it did not relate to
the startling event. There, a witness of an accident
was not allowed to testify regarding the response
of a driver of one of the vehicles concerning the
owner of that vehicle. We stated that "[t]he an-
swer of the driver, if responsive to the question
asked by Wilson, would in no way have related to
the cause of the collision and would not have been
a part of the res gestae." *Id.,* p 48.

*McAvon* was followed in *Sexton v Balinski,* 280
Mich 28, 29-30; 273 NW 335 (1937), in which a
statement regarding the ownership of a vehicle

made fifteen minutes following an accident was held inadmissible.

Other recent decisions in Michigan, while not directly addressing the "relatedness" criterion, suggest this requirement must be satisfied before an excited utterance may be admitted. In *People v Kreiner,* 415 Mich 372; 392 NW2d 716 (1982), the record had not been sufficiently developed with regard to whether the foundational elements of the excited utterance exception had been established. We therefore remanded the case for a new trial where the prosecution would have an opportunity to establish a foundation for admitting the proffered testimony. We observed that excited utterances are admissible "*if* the foundation criteria of the rule are met." *Kreiner, supra,* p 379. The foundational criteria contemplated in *Kreiner* were the familiar requirements set forth in *Gee* and *Rogers,* which require that the statement relate to the circumstances of the startling occasion. *Id.*

As observed by Justice LEVIN in *Ivory Thomas, supra,* p 694, the utterance which occurs following a startling event must be "*a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock.*" (Emphasis added.)

In sum, the statement must relate to the circumstances of the startling occasion in order for the statement to be admissible as an excited utterance.[10] As suggested by Weinstein, it must be

---

[10] Numerous cases from other jurisdictions have held inadmissible spontaneous statements not relating to the startling event. See, e.g., *Anders v Nash,* 256 SC 102, 108; 180 SE2d 878 (1971), *Cook v Hall,* 308 Ky 500; 214 SW2d 1017 (1948), *Adams v Quality Service Laundry & Dry Cleaners,* 253 Wis 334, 338; 34 NW2d 148 (1948), and *American General Ins Co v Coleman,* 303 SW2d 370 (Tex, 1957).

likely that the subject matter of the statement would be evoked by the event.[11]

There was testimony from the complainant at trial that the defendant slapped her during an argument over her demands for money in exchange for anticipated sexual favors. There was no evidence that this slap occurred in the context of the defendant forcing her to perform sexual acts; indeed, she testified that she did not engage in *any* sexual activity at the defendant's house. The complainant's recanted allegations of sexual assaults by the defendant did not relate to the slap to which she later testified. Without independent evidence of a sexual assault or of another startling event linked to the sexual assault, the complainant's earlier accusations do not become admissible as a consequence of her testimony that she was slapped in an argument over money.[12] In the words of Wigmore,

> [T]he matter to be "elucidated" is, by hypothesis, the *occurrence* or *act which has led to the utterance* . . . .[13]
>
> *      *      *
>
> To admit hearsay testimony simply because it was uttered at the time something else was going on is to introduce an arbitrary and unreasoned test and to remove all limits of principle . . . .[14]

We thus conclude that the complainant's trial

[11] 4 Weinstein, Evidence, ¶ 803(2)[01], p 803-95.

[12] We note that the slap to which she testified may not be considered as independent evidence of the assault to which the complainant's purported excited utterances related. The trial judge was not entitled to take the slap testified to at trial out of context. That is, it would be improper to accept the complainant's testimony that she was slapped but reject her assertion that this occurred during an argument over money.

[13] 6 Wigmore, Evidence (Chadbourn rev), § 1754, p 226 (emphasis in original).

[14] *Id.,* § 1757(1), p 238.

testimony does not constitute a sufficient foundation for the admission of her statements to Officer Connors.

D

The trial judge employed the erroneous procedure of allowing the jury to determine whether the foundational criteria of the excited utterance exception had been met. The satisfaction of conditions for admissibility must be determined by the court. *Vega, supra,* p 778; MRE 104.

The testimony of Officer Connors casts serious doubt on the proposition that the complainant's statements were spontaneous despite extensive questioning by Officer Connors and the passage of time.[15] The fact that a statement has been made in

---

[15] On cross-examination, Officer Connors testified as follows:

*Q.* She got in the vehicle and blurted out all of these things that had happened to her; right?

*A.* No, sir.

*Q.* No, sir, it didn't happen like that?

*A.* Not like that, sir.

*Q.* Not like that? She got in the car, she was crying and seemed to be upset. Right?

*A.* She was very upset.

*Q.* Okay. And you started asking her questions; right?

*A.* Not immediately. After she simmered down, I asked her questions.

*Q.* Okay. How long did you allow her to calm down before you began to ask questions?

*A.* Approximately three to five minutes.

*Q.* What did you do during those three to five minutes?

*A.* I just tried to make her feel at ease, safe, and explain to her that everything would be okay, simmer down. Consoling basically.

*Q.* You consoled her three to five minutes and then you asked her questions?

*A.* That's correct.

*Q.* Is it fair to say that most of the things that you've told us, that came from Ms. Jones, came as a response to your questions?

*A.* That's correct.

response to questions is a factor militating against admission. See, e.g., *Holtz v L J Beal & Son, Inc,*

*Q.* Not something she just blurted out to you in her excited state; right?

*A.* They were her answers.

*Q.* Correct. To your questions?

*A.* Correct.

*Q.* Not something—The statement was not something that she just blurted out to you during her excited state; am I correct?

*A.* Correct.

*Q.* Now, you've been an officer ten years—twelve years now; is that right?

*A.* Right.

*Q.* In that time, I would imagine it's fair to say that you interviewed thousands of witnesses; right?

*A.* A large number, yes.

*Q.* And some of those witnesses have been calm and collected; right?

*A.* Correct.

*Q.* And some of them have been not so calm, not so collected, excited; right?

*A.* Correct.

*Q.* Is it fair to say that during the time and over this period of years you've developed your own procedure when you're talking to witnesses?

*A.* Yes.

*Q.* Did you adhere to that ten-year procedure this time?

*A.* Yes, I did.

*Q.* I mean, you asked her questions that you thought would give you responses that would aid you in investigating what might be a crime; right?

*A.* That's correct.

*Q.* So, right there in your car, you conducted this question and answer series?

*A.* Correct.

*Q.* Not too unlike you would do if you had been in the station interviewing a witness; right?

*A.* Correct.

*Q.* Only there you might have the witness to sign the statement and say what they said is accurate; am I correct?

*A.* That would be something that the Investigations Bureau would handle, yes.

*Q.* Okay. But, basically, your interview of Ms. Jones was not too dissimilar from an interview—any other interview you've conducted at the station; right?

*A.* That's correct.

339 Mich 235, 240; 63 NW2d 627 (1954); *People v
Petrella,* 124 Mich App 745, 759-760; 336 NW2d
761 (1983), aff'd 424 Mich 221; 380 NW2d 11
(1985). Similarly, the passage of time is another
factor in the court's determination regarding
whether the witness was still under the influence
of an overwhelming emotional condition. See, e.g.,
*People v Straight,* 430 Mich 418, 425; 424 NW2d
257 (1988). In *People v Petrella, supra,* the Court
of Appeals held a statement inadmissible where it
was unclear whether the statement was given in
response to a question, where the statement was
made at least forty minutes after the event, and
where the declarant had composed herself enough
in the period following a sexual assault to place a
phone call. *Id.,* pp 759-760. It is unnecessary for us
to determine whether the interposition of ques-
tions or the passage of time deprived the state-
ments of the requisite spontaneity because the
statements were otherwise inadmissible.[16]

### III. CONCLUSION

The complainant's statements to the police were
not admissible under MRE 803(2). In light of this
holding, we decline to reach the defendant's re-
maining issues. The defendant's convictions are
reversed, and this case is remanded for proceed-
ings consistent with this opinion.

LEVIN, CAVANAGH, and ARCHER, JJ., concurred
with BRICKLEY, J.

RILEY, C.J. *(separate opinion).* I write separately

---

[16] To the extent that Justice BOYLE suggests that the burden was on
the defendant to show an absence of spontaneity, *post,* p 316, n 21, we
disagree. The burden rests with the party seeking to admit the
evidence to show that the foundational prerequisites have been satis-
fied.

to indicate that while I agree with Justice BOYLE that the complainant's statements to the police officer were properly admitted as excited utterances under MRE 803(2), I disagree that there was insufficient evidence to support the defendant's conviction of first-degree criminal sexual conduct.

A conviction of first-degree criminal sexual conduct requires proof of sexual penetration with another, the use of force or coercion, and personal injury to the victim. MCL 750.520b(1)(f); MSA 28.788(2)(1)(f). Personal injury includes "bodily injury, disfigurement, mental anguish, chronic pain, pregnancy, disease, or loss or impairment of a sexual or reproductive organ." MCL 750.520a(j); MSA 28.788(1)(j).

My review of the record indicates that the prosecution presented sufficient evidence of "bodily injury." There was testimony that the defendant repeatedly slapped the victim during the sexual assaults. Furthermore, there was testimony that the defendant had "roughhoused" the victim and had forcibly taken off her clothes. There is no indication in the criminal sexual conduct statute that the injuries suffered "must necessarily be permanent or substantial." *People v Kraai*, 92 Mich App 398, 403; 285 NW2d 309 (1979), lv den 407 Mich 954 (1980). Accordingly, I would hold that there is sufficient evidence of "bodily injury" in this case.

This conclusion would make it unnecessary for us to decide whether the trial court's instruction relating to mental anguish was error which requires reversal. I would affirm the Court of Appeals.

GRIFFIN, J., concurred with RILEY, C.J.

BOYLE, J. (*dissenting*). The majority errs in hold-

ing that the complainant's statements to the police officer were inadmissible under the excited utterance exception because there was no independent evidence of a forcible criminal sexual assault.

The requirement of forced sexual relations, bruising, signs of force, ripped or torn undergarments, or other witness corroboration, as proof that something out of the ordinary occurred evokes the long discredited notion that a person must be injured in order to be a rape victim. The issue is not whether there was "independent" evidence of a startling event. Properly understood, the issue is simply whether the trial judge's determination of relevancy, i.e., that it was more likely than not that a sexual assault occurred, was erroneous.

The condition of the victim, the defendant's possession of the victim's underwear and shoes, the victim's three subsequent consistent statements, including her allegations of attempted intimidation,[1] and the victim's preliminary examination testimony provided far in excess of the preponderance standard required by MRE 104. Thus, it is unnecessary to reach the questions whether a proffered excited utterance "standing alone" may be used to establish the happening of the startling event, *ante,* p 271, and whether the statements were properly admitted under the excited utterance exception.[2]

However, I am not persuaded that there was sufficient evidence to support the defendant's con-

---

[1] The record contains information regarding three visits made to the complainant's home within twenty-four hours of the sexual assault by people who asked her to drop the charges against the defendant and informed her that the defendant was a big man who had killed before, and the victim's statement that she thought she would be in physical danger if she proceeded with the charge. See *ante,* pp 276-278.

[2] MRE 803(2).

victions of first-degree criminal sexual conduct. Therefore, I would reverse the convictions and remand for entry of convictions of third-degree criminal sexual conduct and for resentencing or for a new trial in accordance with this opinion.[3]

I

The defendant was convicted by a jury of two counts of first-degree criminal sexual conduct[4] and was sentenced to life in prison. The victim, the complainant in the case, was forced to perform and submit to acts of cunnilingus and fellatio at the defendant's home in the early morning hours of August 5, 1983.

---

[3] Where one of two alternative theories of guilt is legally insufficient to support a conviction, and where it is impossible to tell upon which theory the jury relied, the defendant may be retried on the second theory which could support a conviction. See, for example, *People v Grainger,* 117 Mich App 740, 755; 324 NW2d 762 (1982).

The prosecutor may, upon notification of the trial court before resentencing, request that the court vacate the convictions and grant a new trial on the charge of first-degree criminal sexual conduct in count two. *People v Jenkins,* 395 Mich 440, 443; 236 NW2d 503 (1975).

We do not address whether the prosecutor's alternative theory of first-degree criminal sexual conduct in count two, on the ground that the defendant was aided or assisted by one or more persons, would support a conviction. MCL 750.520b(1)(d)(ii); MSA 28.788(2)(1)(d)(ii).

Similarly, we find it unnecessary to address the issue raised by the defendant that the jury instruction on the element of mental anguish was error requiring reversal.

In regard to the defendant's remaining issue, the trial court did not err in allowing the prosecutor to impeach the victim's recantation with evidence that she had received threats that included references to other crimes committed by the defendant. It clearly was proper to inform the jury regarding those efforts, and the trial judge cautioned the jury that the admission of evidence of earlier statements made by the victim had been permitted solely for the purpose of testing or judging the believability of the testimony which the victim made under oath, and not as evidence to prove any of the elements of the crime.

[4] The complaint charged the defendant with two counts of first-degree criminal sexual conduct under the following circumstances: the defendant effected sexual penetration through force or coercion, and the victim sustained personal injury, as proscribed by MCL 750.520b(1)(f) and 750.520b(2); MSA 28.788(2)(1)(f) and 28.788(2)(2).

At approximately 5:30 A.M. on that day, Officer Connors of the Southfield Police Department testified that while on routine patrol he observed the victim running down the side of Nine Mile Road in a disheveled state, and pulled over to investigate the situation. He stated that the woman was running in a manner that was a fast walk to a run and that she kept looking back over her shoulder as she ran.

He testified further that the woman's dress was twisted on her body, that she wore no shoes, that she was crying, and that when he pulled next to her, she tried to get into the car before he could unlock the door. The officer further testified that, at first, the victim was crying so hard she could not even indicate what the problem was, but that after three to five minutes she said that she had been sexually assaulted at a house on Plumbrooke by a man named "Norman."

The victim stated that she had gone with a male friend to the defendant's house at two o'clock that morning and that another female was present at the house when they arrived. After her friend left, the defendant came downstairs and ordered both women to remove their clothing. The victim said both she and the other woman refused at first, and then the defendant forcibly took her clothing off, grabbed her, slapped her around and threatened her with bodily harm. The defendant ordered the women to perform oral sex on each other and after more threats and some "roughhousing" the victim complied with the defendant's orders.

The victim then stated that the defendant grabbed her and forced her to go upstairs to his bedroom where he ordered her to perform oral sex on him. When she refused he threatened her again, grabbed her head and forced his penis in

her mouth. The victim then pretended to have to go to the bathroom, and instead ran downstairs, grabbed her dress, threw it on, and ran out the door.

After telling the officer what had happened, he reported that the victim continued crying, clutched her hands, and appeared to be in a "trance-like" state, depressed, and, as the officer described it, "very numb."[5] Trial testimony established that the defendant was arrested when he left his home later the same morning, carrying a small cloth bag in which the victim's panties and shoes were found,[6] and that when the police searched the house they found the victim's brassiere.

After leaving the hospital, the victim gave a statement to a detective in the police department in which she repeated the story she had told the officer earlier that day. That afternoon the victim received two telephone calls from people she believed to be acting on the defendant's behalf. They asked her to drop the charges.

Around midnight of the same day, one of the persons that had called and another person representing himself as an attorney came over to the victim's apartment. They blamed the victim for what had happened and told her that the defendant was a very big and powerful man, and that

[5] The victim was taken to the hospital but was not medically examined because there were no outward signs of injuries. In addition, the sexual acts alleged would not have produced trace evidence detectable with the standard rape kit since the victim stated the defendant had not ejaculated in her mouth.

[6] Two officers were sent to the defendant's house to secure the premises and not let anyone enter until the detectives came back with a search warrant. They knocked on the door and checked the doors and windows to see if they were locked. Although it appeared that no one was home, after approximately two hours the defendant left carrying a bag.

he had beaten cases before, even a "natural life"
murder case just a year ago.[7]

The next day, a Saturday, the victim and the
two gentlemen who had visited her the previous
night went to the 46th District Court to see about
getting the charges dropped, but the court was
closed. On Monday, when two detectives contacted
the victim after having been informed that she
had sought to have the charges dropped, she told
the police about the calls and visits and that she
feared for her safety. Despite these contacts the
victim reaffirmed the facts alleged in her initial
contact with Officer Connors and gave a third
statement to the officers.[8]

On August 9, 1983, the victim for the fourth
time stated that a sexual assault had occurred. At
this time she gave a lengthy statement again
detailing the sexual assaults, related that calls
were made to her regarding the charges against
the defendant, and described the midnight visit of
the two men.[9] This statement was taped and tran-
scribed.

---

[7] The presentence report indicated that in that case the defendant
was charged with first-degree murder on September 15, 1980, and was
found guilty by a jury on December 16, 1980, of second-degree murder
and possession of a firearm during the commission of a felony. He was
sentenced to life in prison.

However, on June 10, 1982, the case was remanded for a new trial,
and at that trial a jury found the defendant not guilty. In that case,
the defendant and another person had allegedly gone to a residence
and, while the other person waited in a car, the defendant allegedly
went to the door, talked to the person who opened the door, and then
shot him in the abdomen.

The presentence report included information that the defendant
had been charged with third-degree criminal sexual conduct in 1984
and that the victim declined to prosecute. There was also one other
report of another similar incident in which the victim did not wish to
prosecute.

[8] The police testified they were concerned for her safety and that
they did not doubt that she should be lodged for her own protection.
On the evening of August 9, after the taped statement was given, a
material witness warrant was issued and the victim was taken into
custody. However, she was released the next day.

[9] The victim had first been taken to the Oakland County Prose-

At the preliminary examination, the victim changed her story and testified that the charged sexual assaults did not occur, although she admitted making statements to that effect to the police.[10]

Prior to trial, the defense counsel made a motion in limine to preclude the prosecution from using the statements made to the police officer immediately after the alleged sexual assault.[11] The trial judge found the testimony admissible under the excited utterance exception.

At trial, the victim testified that the alleged sexual assaults never occurred, and, further, that she did not remember making a statement to that effect in the early morning hours on August 5, 1983.[12] The victim acknowledged, however, that

cutor's Office and offered protection, which she declined, and then returned to the Southfield police station where she gave the taped statement. She was offered protection in the form of relocation or under a witness protection program.

[10] The preliminary examination was held on August 29, 1983, and the defendant was bound over to the circuit court to stand trial on the charges contained in the complaint and the warrant.

During the exam, the victim denied that anyone had forced her to do anything against her will the night she was at the defendant's home. The court noted that the statements made to the officer the night of the incident were admissible and the fact that the victim now recanted indicated either that the victim was guilty of perjury at this examination, or that she was guilty of making a false police report.

[11] On February 14, 1985, the motion to quash the information was argued before the circuit court where the defendant maintained that court lacked jurisdiction to try the instant case on the basis of fatal irregularities at the preliminary examination proceeding. However, the motion was denied because the trial judge decided that on the basis of the preliminary examination transcript, the totality of the evidence presented before the magistrate was of such a nature that the district judge had probable cause to bind over the matter, and thus did not abuse his discretion.

[12] The victim also testified that she did not remember what it was she told the other officer later that same morning at the police station. She testified that she had gone to the defendant's house on the night in question to supply the defendant with sex for money. She stated that she and the defendant had argued loudly about the money for five to ten minutes, and that the reason she ran out of the house was because the defendant had slapped her.

she had told the officer the defendant slapped her, and that she had run out of the house without all her clothes because she was frightened. She also stated that she did not remember what she had told the detectives during the taped interview, either about the assault or the threats which were made to her afterwards. The taped statement was admitted into evidence for the purpose of impeachment.

At the close of the prosecution's case, the defense rested without presenting proofs. The jury was instructed on the elements of first-degree criminal sexual conduct on two separate theories,[13]

The other woman at the house that night testified that the victim was at the defendant's house, but she did not recall seeing or hearing anything that would indicate something was wrong until the victim ran out of the house.

[13] The trial judge instructed the jury:

The defendant here is charged with two counts of criminal sexual conduct in the first degree. The defendant pleads not guilty to both of these counts. To establish count one, the prosecution must prove each of the following elements beyond a reasonable doubt. First, that the defendant engaged in an oral sexual act with [the victim], that is, a touching between the mouth of one party and the sex organs of the other. It is alleged in this case in count one that the sexual act was committed by a touching of [the victim's] mouth with the penis of the defendant, this is fellatio.

Second, that the defendant caused personal injury to the complainant. Personal injury means bodily injury, bodily injury can be mental anguish, mental anguish means suffering which occurs at the time of the alleged act.

Third, that the defendant used force or coercion to commit the sexual act. The term force or coercion means the use of actual force, by actual physical force by the defendant or any action or threats sufficient to create a reasonable fear of dangerous consequences. It is sufficient for us, if the defendant overcame the complainant through the actual application of physical force or physical violence or it is also sufficient for us, if the defendant made the complainant submit by threatening to use force or violence on the complainant and the complainant believed that the defendant had the present ability to carry out those threats.

To establish count two, criminal sexual conduct in the first degree, the prosecution must prove each of the following ele-

and also on the lesser included offense of third-degree criminal sexual conduct.[14] The defendant was found guilty of first-degree criminal sexual conduct on both counts, fellatio and cunnilingus, and the trial judge sentenced the defendant to a term of life imprisonment.[15]

---

ments beyond a reasonable doubt. First, that the defendant forced [the victim] to engage in an oral sexual act with another person. That is, the touching between the mouth of one party and the sex organs of the other. It is alleged in count two that the sexual act, cunnilingus, was committed by the touching of [the victim's] mouth with the vagina of [the other person] or vice versa.

[The second and third elements of count two under this theory are the same as the second and third elements of count one.]

An alternative way in which the People can establish criminal sexual conduct in the first degree in count two is to prove first, that the defendant forced [the victim] to engage in an oral sexual act with another person. That is the touching between the mouth of one party and the sex organs of another. It is alleged in count two that the sexual act, cunnilingus, was committed by touching of the mouth of [the victim] to the vagina of [the other person] or vice versa.

Second, that before or at the time of the alleged act, the defendant was aided or assisted by one or more persons. It is sufficient if such other person or persons either performed any acts or gave encouragement which aided in the commission of the crime.

Third, that the defendant used force or coercion to have the victim commit the sexual act.

[14] The judge further instructed:

If you find the defendant not guilty, either count, that is criminal sexual conduct in the first degree, the two counts that we have here, you may consider whether the defendant is guilty of criminal sexual conduct in the third degree, a lesser included offense of first degree criminal sexual conduct.

Here's the criminal sexual conduct in the third degree. To establish this charge, the prosecution must prove each of the following elements beyond a reasonable doubt. First, that the defendant engaged in an oral sexual act with the complainant. That is the touching between the mouth of one party and the sex organs of the other. It is alleged in this case that the sexual act was committed by a touching of the mouth of the complainant with the penis of the defendant and the mouth of [the victim] with the vagina of [the other person].

[15] When sentencing the defendant the trial judge noted:

On appeal, the defendant's convictions were affirmed,[16] and this Court remanded the case to the Court of Appeals for further consideration of the excited utterance issue, and, in particular, the defendant's argument that the complainant's statements should not have been admitted as excited utterances because the statements themselves were the only evidence that an event capable of provoking an excited utterance had occurred.[17]

On remand, the panel indicated that it had not

> I also had the opportunity to sit through this trial and observe all the witnesses and hear the totality of the testimony. I am satisfied that on the date in question, the jury was correct in finding that an act did occur. In fact, two acts; . . . I am satisfied that both those acts occurred and that they were extremely violent acts against both parties. Therefore, I am satisfied in the totality of the testimony and my observation of the pre-sentence report that you should be turned over to the Department of Corrections for a term of life.
>
> \*    \*    \*
>
> I'm making this decision on the basis that I consider you a very violent person based on the testimony that I heard during trial and I am satisfied that it is important to keep you off the streets. I'm sentencing you under *People v Cole* [411 Mich 483; 307 NW2d 687 (1981)], wherein I'm sentencing you for the purpose of disciplining you and punishing you and also for the protection of society. I am satisfied that, in regards to item 3 of the *People v Cole,* that rehabilitation is no possibility in your regard. I am also—hopefully [sic] that others will be deterred from these violent acts against our fellow human beings.

[16] *People v Burton,* unpublished opinion per curiam, decided March 12, 1987 (Docket No. 85654).

The Court of Appeals concluded that the trial court did not abuse its discretion when it admitted the victim's statement into evidence as excited utterances, and that reversal was not warranted on this ground.

The panel also addressed the defendant's other issues and found the evidence sufficient to support the defendant's convictions of first-degree criminal sexual conduct. Further, although the panel agreed with the defendant that the jury instruction incorrectly described the degree of mental anguish necessary to constitute personal injury, they concluded manifest injustice did not result from the use of the erroneous jury instruction.

[17] *People v Burton,* 430 Mich 891 (1988).

specifically addressed the argument that there was
no independent proof of the startling occurrence
due to the abundant independent evidence of such
an event, which was established in the record.[18]
They concluded the statements were properly ad-
mitted, and, thus, it was for the jury to decide
whether they believed if the events described in
the statements actually had transpired.

This Court granted leave to appeal the following
issues:

(1) Whether the complainant's initial statements
to the responding police officer were properly ad-
mitted as excited utterances under MRE 803(2);

(2) Whether there was sufficient evidence to sup-
port the conviction of first-degree criminal sexual
conduct;

(3) Whether the jury instruction on the mental
anguish element of the offense was error requiring
reversal; and

(4) Whether the trial court erred by allowing the

---

[18] *People v Burton,* unpublished opinion per curiam of the Court of
Appeals on remand, decided November 18, 1987 (Docket No. 102528),

  [W]e note that when the officer spotted the victim running
  down the road she had no shoes on and her dress was twisted
  on her body. She kept looking back over her shoulder as she
  ran. When she spotted the patrol car, she ran over to the
  vehicle and tried to get in before the officer could unlock the
  door. Initially, she was crying too hard to indicate what had
  happened.
  After relating her story, while continuing to cry off and on,
  complainant repeated her story in a statement to another
  officer later that morning. Also that morning, the police ar-
  rested defendant while he was leaving his house. After arrest-
  ing defendant, the police, armed with a search warrant, discov-
  ered complainant's bra in the upstairs bedroom and her under-
  pants and shoes inside a small cloth bag carried by defendant.

prosecutor to impeach the complainant's recantation with evidence that she had received threats that included references to other crimes committed by the defendant.[19]

II

We note initially that we believe the majority's conclusion regarding the excited utterance[20] stems from a misapprehension of what evidence the trial judge may consider in the MRE 104 determination.

The majority states that the issue is whether "statements may be admitted when there is no independent evidence, direct or circumstantial, of the underlying startling event . . . ." *Ante,* p 271. The majority then concludes that there was no evidence other than the victim's statement that the startling event occurred, and that the most that was established by the independent proof was a "stressful event with sexual connotations."[21] *Ante,* p 299.

---

[19] *People v Burton,* 430 Mich 891 (1988).

[20] An excited utterance is defined as:

A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. [MRE 803(2).]

[21] The majority also claims that the testimony of Officer Connors cast serious doubt on the proposition that the complainant's statements were spontaneous despite extensive questioning by Officer Connors and the passage of time. *Ante,* p 302. However, whether these factors deprived the statements of the requisite spontaneity is not addressed since the statements were otherwise inadmissible.

While the time between the startling event and the excited utterance and whether the declaration was made in response to a question are important factors, the application of the excited utterance exception depends "entirely on the circumstances of each case." 6 Wigmore, Evidence (Chadbourn rev), § 1750, p 204. The facts do not show, as the trial court found, that the statements were a product of reflection and deliberation, or that the statements should have been excluded since

The majority purports to acknowledge that the "extrinsic" evidence available to the trial court in determining admissibility under MRE 104 is not limited to evidence that would be admissible at trial and that a trial judge is not bound by the Rules of Evidence except those with respect to privileges when resolving preliminary factual questions concerning the admissibility of extrajudicial declarations under MRE 104(a).[22] However, because the majority proceeds on the erroneous assumption that the trial judge must determine whether the startling event occurred without considering the statement itself, it has converted the Rule 104 inquiry into a corpus delicti rule in which the trial judge must find "independent evidence" of the happening of the event in order to permit the jury to determine whether the event occurred.

Rule 104 of the Michigan Rules of Evidence, identical to Rule 104 of the Federal Rules of Evidence, provides, in part:

(a) Questions of admissibility generally. Prelimi-

the exact length of time between the event and the utterance was not established.

[22] As all authorities recognize, MRE 104(a) permits the court to base its evaluation of the reliability of the statement on hearsay statements and other inadmissible evidence. Much of the structure of exclusionary rules of evidence has grown out of the courts' attempts to shield the jury from all but reliable testimony and evidence. However, since the judge generally will be fully cognizant of the weakness of evidence by affidavit or hearsay, such weakness will be taken into account when evaluating its weight on the preliminary question in a suppression hearing. Thus, there is no real need to erect the structure of exclusionary rules. 1 Weinstein, Evidence, ¶ 104[02], p 104-22.

In addition, the degree to which a judge should depart from the rules of evidence will depend on the circumstances in each case. Where the preliminary fact is one that can be proved only by the admission of the assertedly inadmissible evidence, for example, a judge may examine the contents of an excited utterance to determine if it relates to the startling event. 21 Wright & Graham, Federal Practice & Procedure: Evidence, § 5055, pp 274-275. See also McCormick, Evidence (3d ed), § 53, p 136, n 8.

nary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Thus, the Rules of Evidence governing trials do not govern hearings under MRE 104(a) to determine the admissibility issue.[23]

In *United States v Matlock,* 415 US 164, 174-175; 94 S Ct 988; 39 L Ed 2d 242 (1974), the United States Supreme Court held that the district court erred in excluding from evidence as inadmissible hearsay out-of-court statements made to the officers at the time of the search to determine the issue of consent at a suppression hearing. *Id.,* p 172. Despite the fact that at the hearing the witness denied that she gave consent to search, the Court held that the trial judge was entitled to consider the fact that the witness had made three prior consistent hearsay statements indicating that she had authority to give consent and to give

---

[23] The advisory committee note to Rule 104(a) gives examples of matters encompassed by the rule, unavailability of a hearsay declarant and the against-interest nature of a hearsay declaration. Thus, it has been recognized that the trial court may rely on hearsay statements made to doctors and nurses by a declarant deceased at the time of trial in deciding the declarant's mental capacity under FRE 104(a). *Huff v White Motor Corp,* 609 F2d 286 (CA 7, 1979). In addition, hearsay evidence, including grand jury testimony of a deceased witness may be considered, "as will all other relevant evidence," making a Rule 104(a) determination of waiver on a confrontation issue. *United States v Mastrangelo,* 693 F2d 269, 273 (CA 2, 1982). In determining the status of records as business records, a court "may rely upon evidence which is wholly inadmissible, or is admissible only against certain parties, in determining whether or not the proffered documents meet the requirements of [the hearsay exception]." *Zenith Radio Corp v Matsushita Electric Ind Co,* 505 F Supp 1190, 1230 (ED Pa, 1980).

them "such weight as his judgment and experience counsel."[24] *Id.,* p 175.

As in *Matlock,* no reason has been advanced in the instant case to doubt that the four statements to which the police officers testified at the hearing had, in fact, been made. The victim herself admitted making the statements, and it was reasonable for the trial judge to consider them in the relevancy determination, given their consistency with each other and the corroborating physical evidence. Moreover, the trial court was entitled to consider the fact that the victim had been threatened and had thereafter repeated her initial version of the offense in finding that the startling event occurred. In this connection Justice BRICKLEY fails to observe that the relevant inquiry was not whether the intimidation attempts originated with the defendant but rather whether the fact that the victim repeated her original version of the event after those attempts bore on the Rule 104(a) issue as to whether it was more likely than not that the startling event occurred. Finally, the determination of preliminary fact on which relevancy turns, i.e., that it was more likely than not that the startling event had occurred, was supported by the facts (admissible also on the issue of guilt) that when the defendant emerged from the home on the morning of the rape, he was carrying her panties and shoes and that her brassiere was found in his bedroom.

The purpose of the Rule 104(a) determination, in the present context, is only to determine whether the preliminary fact has been shown by a prepon-

---

[24] The Court observed that the Rules of Evidence normally applicable at criminal trials do not apply with full force to proceedings in which the judge himself is considering the admissibility of evidence, and that Rule 104 was consistent with the views of various authorities on evidence. *Id.,* p 174.

derance of evidence,[25] not to establish the defendant's guilt.[26] It is clear that the majority's formulation of the rule fails to take into account myriad relevant facts which, although not admissible as proof of guilt, supported the trial court's determination.

The majority draws its extrinsic evidence analysis from decisions holding conspirator statements inadmissible unless there is independent proof of the conspiracy. Support for an analysis of MRE 104 that would impose a similar requirement on the excited utterance hearsay exception is undermined by the fact that the United States Supreme Court has not similarly construed FRE 104(a), and that our own court's construction of this hearsay exception is based on specific language in MRE 801(d)(2)(E).

In *Bourjaily v United States,* 483 US 171; 107 S Ct 2775; 97 L Ed 2d 144 (1987), the Court eliminated the requirement that the underlying conspiracy must be proven independent of the hearsay conspirator's statements as a condition for admission of the statements. The Court held that under FRE 104 the trial court may consider "any evidence whatsoever" (*id.,* p 178) except that which is privileged, including the content of the hearsay

[25] While the question what standard of proof the judge is to use in deciding preliminary questions of fact is not specified in MRE 104(a), it appears that the standard is "a preponderance of the evidence," which means that it is more likely than not that the event described occurred. 21 Wright & Graham, n 22 *supra,* § 5053, p 262. See also *Miller v Keating,* 754 F2d 507 (CA 3, 1985).

[26] The rationale for the use of the excited utterance exception to the hearsay rule lies in its purported reliability, premised on a finding that there is no opportunity for contrivance at the time the statements were made. *People v Gee,* 406 Mich 279, 282; 278 NW2d 304 (1979). The key to the exception is that the statements are made before there is time to contrive or misrepresent and while the "nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance." *People v Ivory Thomas,* 14 Mich App 642, 650; 165 NW2d 879 (1968).

statements themselves to determine preliminarily, the existence of the conspiracy and the defendant's participation in it (at least where there was corroboration of the hearsay). The *Bourjaily* Court observed that "[i]f the opposing party is unsuccessful in keeping the evidence from the factfinder, he still has the opportunity to attack the probative value of the evidence as it relates to the substantive issue in the case." *Id.,* 483 US 180.

While the majority observes that *People v Vega,* 413 Mich 773; 321 NW2d 675 (1982), requires independent evidence of a conspiracy, and "militates in favor of reading a similar requirement into the excited utterance rule," *ante,* p 282, it fails to observe the significance of the fact that *Vega* is based on language added to the federal equivalent of MRE 801(d)(2)(E) requiring independent proof of the conspiracy.[27] The excited utterance exception, MRE 803(2), is, by contrast, identical to its federal counterpart, and it is clear under federal precedent that the "independent" proof requirement imposed by the majority does not obtain.[28] In any event, once it is recognized that

---

[27] The lead opinion notes that the failure of an independent proof requirement, would "lift [hearsay] by its own bootstraps to the level of competent evidence," *Vega, supra,* p 780, quoting *Glasser v United States,* 315 US 60; 62 S Ct 457; 86 L Ed 680 (1942). However, the United States Supreme Court observed in *Bourjaily, supra,* that *Glasser* was decided before Congress enacted the Federal Rules of Evidence in 1975, and, concluded "To the extent that *Glasser* meant that courts could not look to the hearsay statements themselves for any purpose, it has clearly been superseded by Rule 104(a)." *Bourjaily,* 483 US 181. Any rule barring consideration of the hearsay statements per se during preliminary fact finding was not required in determining the existence of the conspiracy. *Id.,* 483 US 180.

[28] *Wetherbee v Safety Casualty Co,* 219 F2d 274 (CA 5, 1955); *Lampe v United States,* 97 US App DC 160; 229 F2d 43 (1956), cert den 359 US 929 (1959) (circumstantial evidence inferred from the victim's condition such as injuries or state of shock is admissible evidence). See also anno, *Criminal law—res gestae-principal act,* 38 ALR4th 1237. There are no cases which support the conclusion of the lead opinion that there must be independent evidence of *the* startling event for purposes of the excited utterance exception.

the 104(a) ruling need not rest on admissible evidence, it is unnecessary to look to *Vega* as analogous authority. There is ample 'relevant evidence of the happening of the event.

The majority does not argue that a sexual assault is not a startling event, or that a statement made by a woman, found running down a road at approximately 5:30 A.M. wearing no shoes or underwear, with her dress twisted on her body, that she had been sexually assaulted, was made while still under the stress caused by the event. What divides us is the majority's assumption that MRE 104 requires that the startling event must be shown *independently* of the statement. *Ante*, p 295. While it is true that a minority of jurisdictions hold that a startling event cannot be shown from the making of the statement, these cases do not stand for the proposition that the trial court may not consider the fact that the statement was made in deciding preliminary admissibility.

The majority's superimposition of an independent proof requirement and its failure to recognize that all of the evidence, including hearsay, adduced at the preliminary hearing may be considered in determining admissibility, undoubtedly accounts for the fact that there are no cases cited in the lead opinion, including the case claimed to be directly on point, in which the courts have found any corroborating evidence and not admitted the statements under the excited utterance exception.[29]

[29] In *Commonwealth v Barnes*, 310 Pa Super 480; 456 A2d 1037 (1983), the court observed that the extrajudicial statement was the only evidence that any crime had been committed, noting that a search of the defendant's apartment conducted within twenty minutes of the alleged robbery failed to produce any part of the money alleged to have been stolen, an observation inconsistent with the situation in this case in which the victim's brassiere was discovered where she said it would be discovered in the excited utterance. *Id.*, p 485.

See also *People v Straight*, 430 Mich 418, 425; 424 NW2d 257 (1988), citing McCormick, n 22 *supra*, and 4 Weinstein, Evidence, ¶ 803(2)[01], pp 803-87 to 803-89.

For example, in *People v Leonard,* 83 Ill 2d 411,
418-419; 415 NE2d 358 (1980), the court, in revers-
ing the lower court's decision and admitting the
statements, held that any circumstantial evidence
under circumstances which appear reliable is suffi-
cient corroboration of the underlying startling
event. Furthermore, the lower court's reliance on
*Truck Ins Exchange v Michling,* 364 SW2d 172
(Tex, 1963), was misplaced because in *Michling,*
the *only* evidence offered to prove that the de-
ceased employee suffered an injury arising out of
his employment was a statement to that effect
given by his widow, and there also was strong
evidence to suggest its unreliability. *Id.*

Courts that have relied on *Michling* do so only
in situations in which there is *absolutely no evi-
dence* to corroborate the event or the statement.[30]
*Ante,* pp 285-286. Thus, the majority's discussion
of *Michling* is inapplicable to the case before this
Court, and, therefore, there is no support for the
majority's conclusion that the condition of the

---

The lead opinion cites the following cases as examples of situations
in which courts did not admit statements under the excited utterance
exception because there was no independent evidence of the startling
event. However, the cases actually are examples of situations in
which the statements could not be considered reliable because they
were not the product of the type of event which is considered
sufficiently startling under the exception, or there was no evidence of
excitement, or there was no way for the court to determine the time
lapse between the statement and the event.

In *Brown v United States,* 80 US App DC 270; 152 F2d 138 (1945),
the court found "no evidence in the *child's story* or, otherwise, that
she actually suffered mental disturbance," inferring that had the
child evidenced *excitement,* the statements would have been admissi-
ble. Further, *Rogers v Saginaw B C R Co,* 187 Mich 490; 153 NW 784
(1915), was not a situation in which a party attempted to use the
statement itself to establish its own spontaneity. *Ante,* p 280. In that
case the Court did not admit the statements because there was no
evidence of *when* the event took place and, therefore, it was not
possible to determine whether the declarant had time to contrive or
reflect before making utterances. See also *People v Cunningham,* 398
Mich 514; 248 NW2d 166 (1976). See also *Jones v United States,* 97
US App DC 291; 231 F2d 244 (1956).

[30] See, for example, *Richardson v Green,* 677 SW2d 497 (Tex, 1984).

victim,[31] the defendant's possession of her clothes
and shoes,[32] the victim's testimony at the prelimi-
nary examination affirming that she had made
subsequent consistent statements, even after in-
timidating contacts had been made, is insufficient
corroboration of the underlying event.[33]

Finally, even if the majority's approach were
correct,[34] and the circumstances surrounding the

[31] While the admissibility of statements made by a victim after the
commission of a sex crime depends upon a variety of factors, it is
incontrovertible that an important factor is the condition of the
victim at the time of the particular utterance. 29 Am Jur 2d, Evi-
dence, § 719, p 786.

The fact that the victim was dazed, excited, hysterical, bruised *or*
disheveled when making the statements is noted in practically every
case where the utterances are held admissible. See, for example,
*People v Zysk,* 149 Mich App 452; 386 NW2d 213 (1986); see also
*People v Hungate,* 27 Mich App 496; 183 NW2d 634 (1970); *People v
Usher,* 121 Mich App 345; 328 NW2d 628 (1982).

[32] The majority disregards the fact that the victim's underclothes
and shoes were found in the defendant's possession and, instead, notes
these facts as insufficient proof that something out of the ordinary
occurred.

[33] See *United States v Moore,* 791 F2d 566, 570 (CA 7, 1986). In
*Moore,* like the case before this Court, the occurrence of the startling
event was corroborated by evidence other than the resulting excited
utterance, specifically the appearance, behavior and condition of the
declarant. See also 4 Weinstein, Evidence, ¶ 803(2)[01], p 803-87.

In *People v Coleman,* 116 Ill App 3d 28; 451 NE2d 973 (1983), the
statements were not held "inadmissible because there was insufficient
evidence of an underlying startling event." *Ante,* p 284. Instead, the
court did not believe that the argument itself was a sufficiently
startling event. Further, the court noted that even assuming that the
argument was a startling event, there was no indication of the length
of time between the "startling event" and the decedent's statements
to her mother. *Id.*

[34] The lead opinion maintains the initial inquiry is whether an
excited utterance standing alone may be used to establish the under-
lying startling event. *Ante,* p 280. However, whether proof of the
startling event may be made by the statement itself is largely an
academic question since in most cases, as in the instant case, proof is
furnished either by testimony of witnesses other than the declarant,
or by circumstantial evidence that something out of the ordinary
occurred. McCormick, n 22 *supra,* p 855. See also Weinstein, n 29
*supra,* p 803-34.

While in some jurisdictions the statement might have been taken
as sufficient proof that an exciting event occurred, a review of the
case law reveals that there really is no minority rule per se that

incident were the only corroborating evidence of the underlying event, the victim's disheveled appearance, fresh complaint and hysteria corroborated[35] her description of the event,[36] and the statement was properly admitted.[37]

Professor McCormick observed with regard to excited utterances that, as is uniquely illustrated

allows a startling event to be established when the *sole* evidence is the statement even without evidence of stress or excitement on the part of the declarant.

[35] It is remarkable that the majority finds that neither the condition of the victim, nor the fact that when the defendant was apprehended leaving his home he was carrying the victim's underwear and shoes, nor that her brassiere was found in the defendant's bedroom when the search was conducted, are sufficient to sustain admissibility as a preliminary matter when a jury concluded beyond a reasonable doubt that such was the fact.

[36] When a statement that is hearsay is offered under the excited utterance exception, the trial court must make a preliminary factual determination that the declarant was so excited or distraught at the moment of utterance that he did not reflect or did not have an opportunity to reflect on what he was saying. *United States v McLennan,* 563 F2d 943 (CA 9, 1977), cert den 435 US 969 (1978). The record does not support any serious doubt that the victim in this case was in a state of excitement as indicated by the victim's nervousness, shaking, and her crying and sobbing, to the point where she could not even talk to the officer. Thus, the trial court correctly concluded the declarant was still under the influence of the event when she described the sexual assault to the police officer.

[37] The cases cited in the majority opinion as examples of situations in which the Court required independent evidence to prove the existence of the underlying event involve situations in which the court considered the physical condition of the victim in determining whether the declarant had time to contrive or reflect when an appreciable time had lapsed between the event and the statement. *Ante,* pp 286-289.

For example, in *People v Hungate,* n 31 *supra,* p 498, the defendant contended that so much time had elapsed between the alleged abortion and statement that the statement could not possibly be spontaneous. The Court noted the physical condition of the declarant was sufficient evidence to support a finding that a startling event was spontaneous *despite* the fact that so much time had elapsed, and that it appeared the statement was not a deliberate and considered answer to a leading question. *Id.,* pp 499-500. See also *People v Mosley,* 74 Mich App 145, 148; 254 NW2d 33 (1977), in which the Court, when admitting testimony that the victim had stated that her husband "did this to her," relied on the fact that there was evidence of physical violence to infer the event because the victim died immediately after making the statement.

in this case, the "testimony on the stand, given at a time when his powers of reflection and fabrication are operative, is at least no more reliable than his out-of-court statement." McCormick, Evidence (3d ed), § 297, p 855. Thus, whether and why the victim subsequently recanted the allegation does not make the statement inadmissible under the excited utterance exception,[38] and the excited utterance should be given the same force and effect as the in-court testimony of the rape victim.

In sum, whether statements will be admitted under the excited utterance exception is within the trial court's sound discretion.[39] Under the facts of this case, it cannot be said that the trial court abused that discretion in admitting the victim's statements as spontaneous or excited.[40] The trial court as well as the Court of Appeals on remand[41] correctly noted that there was more evidence than the victim's declaration itself that a startling event had occurred. Accordingly, the statements were properly admitted at trial.

---

[38] It is clear from the record that the victim was intimidated by the visits and calls regarding the charge she had brought against the defendant, the violent manner in which the defendant had treated her during the criminal act, and by the issuance of the material witness warrant by the police. Without the excited utterance there would have been no proofs against the defendant and the lack of proofs in this case appear to have resulted from intervening threats against the victim, made either at the defendant's direction or on his behalf, which caused her to recant her story.

[39] See, for example, *People v Hungate,* n 31 *supra,* and *People v Mosley,* n 37 *supra.*

[40] Thus, it is not necessary that the prosecution establish either a majority rule or a disposition on the part of Michigan courts to allow an excited utterance to prove the underlying event in order to justify the admission of the victim's statements in the present case. The conclusion that the prosecutor is using the victim's statement as its own foundation for a finding of a startling event or occasion is without merit or any factual support.

[41] The Court of Appeals did not, as the lead opinion asserts, *decline* to address the issue whether there was independent evidence of a startling event. *Ante,* p 278.

III

The second issue is whether there was sufficient evidence[42] to support the defendant's convictions for first-degree criminal sexual conduct which, in this case, requires sexual penetration with another, the use of force or coercion, and personal injury to the victim. MCL 750.520b(1)(f); MSA 28.788(2)(1)(f).

Resolution of this issue requires that the Court decide whether "a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979), reh den 407 Mich 1164 (1980), cert den 449 US 885 (1980). After reviewing the evidence in the light of the *Hampton* standard, we disagree with the Court of Appeals that the essential element of personal injury[43] was proven beyond a reasonable doubt.

The Court of Appeals considered it unnecessary to address the defendant's claim that there was insufficient evidence of mental anguish because there was sufficient evidence of other personal injury. We disagree. The prosecutor did not claim at trial or in his brief to the Court of Appeals that the personal injury sustained by the victim under count one was other than mental anguish. In addition, in regard to count two, the prosecutor claimed that the evidence of either mental anguish, or, alternatively, of aiding and abetting was

---

[42] In this case, while defense counsel did not make a motion for a directed verdict, this Court has held that in a criminal case a motion for directed verdict or a postverdict motion is not required to preserve a sufficiency claim. *People v Patterson,* 428 Mich 502, 514-515; 410 NW2d 733 (1987). Cf. *Napier v Jacobs,* 429 Mich 222; 414 NW2d 862 (1987), reh den 429 Mich 1213 (1987).

[43] Personal injury is defined as "bodily injury, disfigurement, mental anguish, chronic pain, pregnancy, disease or loss or impairment of a sexual or reproductive organ." MCL 750.520a(j); MSA 28.788(1)(j).

sufficient in and of itself to sustain the defendant's conviction of first-degree criminal sexual conduct without any showing of personal injury.

To support a finding of personal injury on the basis of mental anguish, the record must contain "either direct evidence of intensified mental suffering, such as specific testimony on the point from the victim, or perhaps circumstantial evidence of such suffering, as an inference properly to be drawn from other facts in the record." *People v Petrella,* 424 Mich 221, 275; 380 NW2d 11 (1985).

In most instances, testimony of the victim at trial as to her mental state during the assault, and either for a short or long term thereafter, will be introduced from which the factfinder may find that the victim experienced "extreme or excruciating pain, distress, or suffering of the mind." *Id.,* p 259. In the peculiar factual posture of the present case, such evidence was not forthcoming.

In *Petrella,* this Court firmly rejected the premise that there is a normal or natural emotional reaction to being raped which might be compared to the reaction that would support a finding of mental anguish. There we concluded, however, that evidence that the victim was upset, screaming, and crying during and after the act, and that she was still upset and crying after she arrived at her own apartment, was insufficient evidence standing alone to prove mental anguish.

The mental anguish proof in the instant case which consisted of testimony that the victim was hysterical for three to five minutes and appeared to be numb at the hospital is not as strong as that which was found insufficient in *Petrella.* We observe that there are here, as in *Petrella,* facts from which aggravated emotional distress might have been inferred. In *Petrella,* those facts were that the victim was the defendant's natural daughter;

in this case, that the victim was forced to perform and to submit to cunnilingus in the defendant's presence. However, as in *Petrella,* there is no testimony that this fact exacerbated the complainant's distress. We conclude that this record does not contain sufficient evidence of intensified mental distress.

The evidence was not sufficient to support submission of the mental anguish/personal injury element of first-degree criminal sexual conduct as to count one. As to count two, we are unable to determine from the general verdict whether the jury reached its conclusion on the mental anguish theory or the aiding and abetting theory.

However, since the jury's verdict of guilty of first-degree criminal sexual conduct necessarily found the lesser included offense of third-degree criminal sexual conduct which requires the elements of penetration and force or coercion,[44] the proper remedy in this case is a reduction of the degree of the convictions. See *People v Patterson,* 428 Mich 502 (1987). Accordingly, I would reverse the convictions of first-degree criminal sexual conduct, and remand the case to the trial court for entry of convictions of third-degree criminal sexual conduct and for resentencing.[45]

If, however, the prosecuting attorney is persuaded that justice would be better served, then,

[44] The victim did indicate in her statements to the police that there were sexual penetrations effected by means of force and coercion and this constitutes sufficient evidence to support convictions of third-degree criminal sexual conduct. MCL 750.520d(1)(b); MSA 28.788(4)(1)(b). See *People v Thompson,* 76 Mich App 705; 257 NW2d 268 (1977), in which the Court found that where the aggravating circumstance is force or coercion and personal injury under a charge of first-degree criminal sexual conduct, second-, third-, and fourth-degree criminal sexual conduct were necessarily included offenses. *Id.,* p 708. See also *People v Secreto,* 81 Mich App 1, 3; 264 NW2d 99 (1978), lv den 406 Mich 1019 (1979).

[45] *People v Jenkins,* n 3 *supra,* p 443.

upon notification to the trial court before resentencing, the trial court shall vacate the judgment of convictions and grant a new trial on the charge of first-degree criminal sexual conduct in count two of the complaint.[46]

### CONCLUSION

The trial court properly admitted the statements of the victim to the police officer into evidence under the excited utterance exception. The inability to use a corroborated excited utterance as proof of the startling event is an invitation to the intimidation of witnesses and victims. That is neither required by law nor consistent with sound policy.

The jury rejected the victim's later explanations, apparently discrediting them on the basis of substantial evidence of intimidation. The jury found beyond a reasonable doubt that a sexual assault had occurred. I would urge the Court to consider very carefully the message sent by the opinion to a citizenry all too frequently fearful of becoming involved in a criminal proceeding.

However, although the statements were properly admitted, the evidence was insufficient to support the defendant's convictions of first-degree criminal sexual conduct. I would remand to the trial court in accordance with this opinion.

---

[46] The alternate theory offered by the prosecutor in order to establish criminal sexual conduct in the first degree in count two was that at the time of the act the defendant was aided or assisted by one or more persons. See MCL 750.520b(1)(d)(ii); MSA 28.788(2)(1)(d)(ii). We express no opinion as to whether the statute contemplates a situation such as that described in the incident with the other woman.